United States District Court
Southern District of Texas
**ENTERED**
August 09, 2016
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MAYA SPECIAL MARITIME** | § | |
| **ENTERPRISE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:13-CV-1871** |
| | § | |
| **TUG M.L. CROCHET, HER ENGINES,** | § | |
| **TACKLE, APPURTENANCES, ETC.,** | § | |
| **IN REM, et al,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER ENTERING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.   BACKGROUND

This case arises out of a June 2, 2013 collision in the Houston Ship Channel. The two vessels that collided were the tanker vessel M/T MINERVA MAYA and the tugboat M/V M.L. CROCHET. Plaintiff Maya Special Maritime Enterprise ("Maya") owns the MINERVA MAYA. The M.L. CROCHET is owned and operated by Defendants Crochet Boat Company and D&S Marine Services, LLC (collectively, "D&S Marine").

Maya and D&S Marine brought claims against each other to recover for the physical and economic damages caused by the collision. Before trial, the parties stipulated to the amount of their physical damages and related costs. The remaining issues for trial were liability and economic damages related to the loss of use of the vessels while undergoing repairs.

1

Maya contends that D&S Marine is solely responsible for the collision. Maya argues that D&S Marine is liable based on the following negligent acts: (1) the M.L. CROCHET entered the Houston Ship Channel, despite weather warnings and advisories, rather than holding up at Bolivar Peninsula like other tugboats did; (2) the M.L. CROCHET's tow configuration as a string of five barges was unwieldy in the severe weather conditions; (3) Captain Leonard "Dog" Dupre, the relief captain at the wheel of the M.L. CROCHET at the time of the collision, did not sound his fog horn in violation of Inland Navigation Rule 35; (4) Captain Dupre did not contact the MINERVA MAYA to make a passing arrangement; (5) the M.L. CROCHET and her crew violated Rule 9 by impeding the safe passage of the MINERVA MAYA and not remaining in the designated barge lane; and (6) the M.L. CROCHET and her crew violated Rule 19 by altering the tugboat's course to port shortly before the collision.

D&S Marine asserts that Maya is 100% at fault for the collision. According to D&S Marine, Maya's fault stems from the following negligent acts: (1) the MINERVA MAYA did not have a properly installed and functioning Automatic Identification System ("AIS"); (2) Captain Georgios Kolokotronis, the master on board/captain of the MINERVA MAYA, did not inform the Houston Ship Channel pilots of the second AIS on board the vessel and did not inform the pilots that the ship's AIS sometimes malfunctioned in bad weather; (3) the MINERVA MAYA did not move to starboard after noticing a possible target, nor did a crew member call the M.L. CROCHET or the Houston Vessel Traffic Service ("VTS") on the radio; (4) the MINERVA MAYA's crew violated Inland Navigation Rule 5 by not posting a proper lookout; (5) the crew violated Rule 6 by not navigating at a safe speed; (6) the crew violated 33 C.F.R. § 164.53(b) by not calling VTS to report that the AIS was not working; and (7) the crew failed to monitor VTS Channel 12.

Alternatively, D&S Marine challenges Maya's claim for economic damages. Invoking the sister ship/fleet rule, D&S Marine argues that the MINERVA MAYA is part of a fleet of fifty-six vessels controlled by Minerva Marine, Inc., the true party in interest. Because an idle vessel from this fleet, the M/T ATALANDI, took over the charter party that MINERVA MAYA was scheduled to take while she was undergoing repairs, D&S Marine contends that Minerva Marine, Inc. and/or Maya did not actually suffer any lost profits. D&S Marine further challenges Maya's claim for demurrage as unsupported by the evidence and argues that Maya's claim for damages should be limited to the value of the M.L. CROCHET as required by the Shipowners' Limitation of Liability Act, 46 U.S.C. § 30501.

The Court held a bench trial on February 16–19, 2016. The Court heard live testimony from six fact witnesses and three expert witnesses. The fact witnesses were:

1. Captain Adam W. Guice, one of the two compulsory pilots on board the MINERVA MAYA;
2. Shanti Gala, a field service engineer for navigational equipment who subcontracts for Kelvin Hughes, LLC;
3. Stergios Papangelis, the insurance manager of Minerva Marine, Inc.;
4. Nikos Zarganas, the manager of the Freight, Demurrage, and Defense department at Minerva Marine, Inc.;
5. Captain Leonard "Dog" Dupre, the relief captain at the wheel of the M.L. CROCHET; and
6. Julian Murphy, vice president and corporate representative of D&S Marine.

The expert witnesses were:

1. Captain Elliott Tulloch, a marine surveyor called by Maya;
2. Captain Pete Dolan, an expert in the field of AIS technology called by D&S Marine; and
3. Captain Maurice Ryan, an expert master of vessels called by D&S Marine.

In addition to the live testimony, the Court heard Maya's designated deposition testimony of six more fact witnesses:

1. Francis Roberto Robillos, able body seaman and helmsman of the MINERVA MAYA;
2. Captain Georgios Kolokotronis, master on board/captain of the MINERVA MAYA;
3. Michael Tdamonon, second officer of the MINERVA MAYA;

3

4. Ramfos Eleftherios, a crew operator in the Marine Personnel Department of Minerva Marine, Inc. and Maya's corporate representative;

5. Romeo Castillo, bosun on the MINERVA MAYA and lookout at the time of the collision; and

6. Captain David Rodrigues, second compulsory pilot on board the MINERVA MAYA who was the pilot in command at the time of the collision.

Having considered the testimony, the exhibits, the post-trial briefing, and the applicable law, the Court sets forth the following findings of fact and conclusions of law. Based on these findings and conclusions, the Court finds and holds that the parties are equally at fault for the collision.

## II.   FINDINGS OF FACT

1. Maya Special Maritime Enterprise, a foreign business entity, owns the MINERVA MAYA.

2. D&S Marine Service, LLC, a Louisiana limited liability company, owns and operates the M.L. CROCHET.

3. The MINERVA MAYA is an oil tanker, I.M.O. No. 9233234, with a deadweight of about 105,709 metric tons (or 116,524 U.S. tons) and approximate dimensions of 800 feet in length and 138 feet in breadth. (Plaintiff's Tr. Ex. 19.)

4. The M.L. CROCHET is an uninspected towing vessel, Official Number 1044982, with a gross tonnage of about 96 gross tons and approximate dimensions of 60 feet in length and 24 feet in breadth. (Defendant's Tr. Ex. 1.)

5. On June 2, 2013, the M.L. CROCHET was pushing a "strung-out" tow of five barges, meaning that the barges were arranged in a single line. The barges were centered on the tugboat and each other. The two barges closest to the tugboat were loaded with about 1,400 tons of lubricating oil each. The middle barge was loaded with lighter fluid. The two lead barges were empty. The breadth of the barges ranged from 50 to 54 feet for the

4

lead barges to 35 feet for the loaded barges. Together with the barges, the M.L. CROCHET flotilla was about 986 feet in length. (Tr. Tran. Vol. 3 at 36–38, 41, 108–09.)

6. The M.L. CROCHET has a 1,200-horsepower engine. It can push up to 60,000 barrels. At the time of the collision, the M.L. CROCHET was under this limit. (Tr. Tran. Vol. 1 at 166:21–167:8; Tr. Tran. Vol. 3 at 40:16–41:2.)

7. The collision between the MINERVA MAYA and the M.L. CROCHET took place on the Houston Ship Channel. The Ship Channel is less than 1,000 feet wide. The main channel is 530-feet wide and dredged to 45 feet deep to accommodate deep-draft vessels. The two barge lanes, one on each side of the main channel, are about 230 feet wide and dredged to only 12 feet deep. On the NOAA standard navigation chart of the Galveston Bay Entrance, which includes the Ship Channel, each barge lane is so designated. (Tr. Tran. Vol. 1 at 26–28, 181; Plaintiff's Tr. Ex. 55.)

8. At the time of the collision, the MINERVA MAYA was in ballast. On June 2, 2013 at 3:30 AM, the MINERVA MAYA finished discharging its cargo of about 520,000 barrels of crude oil in Baytown, Texas. While discharging the crude oil, the crew put in ballast water. After discharge and while in ballast, the MINERVA MAYA's draft was about 30 feet aft and 17 feet forward. (Doc. No. 68-3 at 8:5, 12:10–20.)

9. Because of its deep draft, the MINERVA MAYA had to sail in the main channel and could not sail in the barge lanes. The M.L. CROCHET, however, could sail in the barge lanes with its light draft. The Ship Channel is a compulsory piloted port, which means that a pilot must board the vessel to navigate it in and out of the Channel. It is customary in the Ship Channel for pilots of deep-draft vessels to maintain the centerline of the main channel. (Tr. Tran. Vol. 1 at 42:10–15; 46:16–47:23.)

10. At 6:00 AM, two compulsory Ship Channel pilots, Captain Adam W. Guice and Captain David Rodrigues, boarded the MINERVA MAYA at the Exxon Terminal in Baytown. The pilots and Captain Georgios Kolokotronis, the master on board/captain of the MINERVA MAYA, completed their master/pilot exchange. Captain Kolokotronis gave the pilots the pilot card with "information about the vessel, the length, the draft, maneuverability, [and] the speed" and answered any questions the pilots had that would allow them to maneuver the vessel. Even when a compulsory pilot is on board, the master of the vessel retains ultimate authority and responsibility for the vessel's movements. (Doc. No. 68-3 at 8:6–10, 20:22–21:24, 30:16–31:5; Doc. No. 68-11 at 67:1–15.)

11. During the master/pilot exchange, Captain Kolokotronis told the pilots that all of the MINERVA MAYA's equipment was in good order. This equipment included the Automatic Identification System ("AIS"), which displays information about other vessels, such as their GPS position and name. Captain Kolokotronis did not tell the pilots that the vessel had a second AIS. (Tr. Tran. Vol. 1 at 77:15–22, 79:23–80:2, 88:17–18, 89:1–4.)

12. AIS is a collision avoidance system that was implemented in 2004. Each vessel has a radio that transmits the vessel's name, course, and speed on a near constant basis. AIS allows vessels to contact each other by name to make passing arrangements, rather than calling out, for example, "vessel off my starboard bow," which could apply to more than one vessel. Unlike radar, a properly installed and functioning AIS should not be affected by bad weather because it operates on a radio frequency that is not impacted by weather. (Tr. Tran. Vol. 2 at 140:21–144:20.)

13. The MINERVA MAYA set sail from Baytown at about 6:18 AM, traveling outbound in

the Houston Ship Channel. Captain Guice was the pilot in command. The weather was overcast but visibility was good. At the time of the MINERVA MAYA's departure, there was no alert or forecast of bad weather. (Doc. No. 68-3 at 8:10–19; Doc. No. 68-11 at 25:19–26:9.)

14. When the MINERVA MAYA was getting ready to depart from Baytown, Captain Guice checked in with the Houston Vessel Traffic Service ("VTS"). VTS is operated by the Coast Guard. Channel 12 is the radio channel used for communications between vessels and VTS. Vessels on the Ship Channel are required to check in with VTS on Channel 12 when entering the Ship Channel and at certain points along the way. The purpose of VTS is to assist with traffic management and aid in collision avoidance by sharing timely and accurate information. (Tr. Tran. Vol. 1 at 37:6–25; Tr. Tran. Vol. 3 at 155:10–156:1; Doc. No. 68-11 at 10:3–11:8.)

15. Vessels on the Ship Channel are not required to monitor Channel 12. The Commander for the Eighth Coast Guard District issued a letter in 1997 granting "a permanent deviation from the regulations contained in Title 33 Code of Federal Regulations (CFR), Part 161.12, (b), Vessel Operating Requirements (maintaining a listening watch on the VTS frequency)" to the Houston/Galveston area. This deviation remained in place at the time of the collision. The deviation was put in place because the heavy traffic on the Ship Channel means that the amount of irrelevant chatter is distracting to navigation. Rather than requiring monitoring of Channel 12, vessels check in with VTS. (Tr. Tran. Vol. 1 at 38:11–40:25; Plaintiff's Tr. Ex. 80.)

16. Channel 13 is the radio channel used in inland waters for vessel-to-vessel communication. It is customary on the Ship Channel for outbound ships to contact

inbound tugs via Channel 13 to make passing arrangements, unless it is a clear day when no communication is necessary. (Tr. Tran. Vol. 1 at 38:12–18; Tr. Tran. Vol. 3 at 84:5–15.)

17. At about 7:30 AM, Captain Rodrigues took over as the pilot in command. The weather remained the same. Captain Guice stayed on the bridge, along with three other crew members: Captain Kolokotronis; Francis Roberto Robillos, the helmsman; and Michael Tdamonon, the second officer. Romeo Castillo, the bosun,[1] was posted as a lookout on the bow of the vessel. (Doc. No. 68-3 at 14:11–15:12, 28:14–15; Doc. No. 68-9 at 6:11–7:17.)

18. When the MINERVA MAYA was around buoys 51 and 52, Captain Rodrigues noticed a change in the weather. "[T]he wind started to pick up, and there was a fresh breeze somewhere between 20 and 30 miles an hour definitely coming from the northerly direction." Although the temperature had dropped, it had not yet begun to rain. The conditions were "typical of an oncoming squall line." Around this time, the Coast Guard began issuing weather warnings. Captain Rodrigues thought the MINERVA MAYA "may be able to outrun [the bad weather], may be not depending on how fast [the squall is] moving." (Doc. No. 68-11 at 35:17–36:17.)

19. At about 8:00 AM, the M.L. CROCHET left the Bolivar Roads alternate channel and entered the Houston Ship Channel at Buoy 28, heading inbound. The weather was crystal clear. Captain Leonard "Dog" Dupre, the relief captain, was at the wheel. Many other boats remained in Bolivar. It is common in the Ship Channel for boats to cluster up in Bolivar because they are waiting for dock space. Dock space in Texas City and Houston

---

[1] A bosun's duties are to fix the anchor and take care of the anchor. (Doc. No. 68-9 at 4:25–5:3.)

is limited. Although Captain Elliott Tulloch, Maya's expert, testified that he "would assume" that the boats at Bolivar were waiting on the weather to pass, Captain Dupre has 20 to 25 years of experience running towboats on the Ship Channel, including every 24 to 36 hours for the last 10 years. (Tr. Tran. Vol. 1 at 170:7–171:1; Tr. Tran. Vol. 3 at 24:1–26:12, 50:9–11, 69:1–22.)

20. Before entering the alternate channel, the M.L. CROCHET had been navigating the Gulf Intracoastal Waterway ("ICW"). During that part of her run, the M.L. CROCHET was required by regulation to use the strung-out tow configuration, rather than doubling up the barges, unless she sought a special permit. Even when the regulation no longer applied on the wider Ship Channel, the tow configuration was designed to protect the middle barge from damage due to its dangerous cargo of lighter fluid. In addition, configuring the tow in another way would "jeopardiz[e] the handling of the vessel and [the] tow." Captain Dupre could not have stopped at Bolivar to reconfigure his tow because there was no room to do so with all the other tows in that area. Captain Dupre accepted the tow in its strung-out configuration from the ANDREW MCKINNEY, but he has rejected some tows when he thought the configuration was unsafe or exceeded the limits of his company's policy. (Tr. Tran. Vol. 3 at 37:22–41:15.)

21. At 8:03:27 AM, Captain Dupre checked in with VTS on Channel 12. VTS responded with a traffic and weather report. The traffic report included an outbound ship near buoy 42. Although VTS did not identify the ship by name, this ship was the MINERVA MAYA. Regarding the weather, VTS relayed that two tows had reported winds of 45 to 50 knots and visibility of three-quarters to one-and-a-half miles. (Tr. Tran. Vol. 1 at 168:24–170:18; Tr. Tran. Vol. 3 at 116:1–10.)

22. The weather on the Houston Ship Channel is unpredictable. Although one may know to expect rain at some point, "who knows where, when and to what degree." "[S]qualls have a tendency to be very unpredictable in their direction and their speed of direction." (Doc. No. 68-11 at 24; Tr. Tran. Vol. 3 at 197:18–20.)

23. At 8:11:27 AM, Captain Rodrigues used Channel 13 to contact the captain of the M/V MARTHA RENAE to initiate a passing arrangement. Captain Rodrigues announced his position as an outbound ship around buoys 37 and 38. The MARTHA RENAE was sailing inbound and reported strong winds blowing him into the main channel and zero visibility. The captain of the MARTHA RENAE said, "We can try to scoot her over." Captain Rodrigues responded, "Yeah. You might want to just drive her out of the channel. You're not going to win this one." Captain Dupre overheard this exchange. (Tr. Tran. Vol. 3 at 124:11–125:7; Doc. No. 90 at 9 n.6.)

24. In response to the deteriorating weather conditions, Captain Rodrigues made a sécurité call. A sécurité call is transmitted via radio on Channel 13. Although traditionally a sécurité call would begin with "sécurité" repeated three times, that is not the custom on the Ship Channel because it takes too long. Instead, captains simply announce their ships' current position and their estimated arrival time at a particular location. (Tr. Tran. Vol. 1 at 50:24–51:25.)

25. Beginning at 8:13:52 AM, Captain Rodrigues made the following sécurité call: "Outbound ship at 35, 36, be down at the ICW in approximately 15 minutes." This call conveyed that his ship was at buoys 35 and 36 and would be at the Intracoastal Waterway, where the Ship Channel crosses from Bolivar to Galveston, in about 15 minutes. Captain Dupre heard this call. At that time, the M.L. CROCHET was at buoy 30

and in the barge lane. (Tr. Tran. Vol. 1 at 50–52, 173:1–22; Tr. Tran. Vol. 3 at 123:14–20.)

26. No later than 8:14:19 AM, about seven minutes before the collision, the MINERVA MAYA's AIS stopped fully functioning. The pilot's portable pilot unit ("PPU"), which is a laptop computer that pilots bring with them on board a vessel, has an AIS Bluetooth interface device that permits information received through AIS about other vessels to display on the PPU. Captain Rodrigues's PPU stopped receiving AIS data. As a result, the targets displayed on the PPU were stationary because updated positions were not being received. After updated positions are not received for three minutes, the target disappears. This malfunction remained until after the collision, when the AIS began to work again. (Tr. Tran. Vol. 1 at 57–59; Tr. Tran. Vol. 2 at 162, 169–70.)

27. At about the same time that the weather began to deteriorate, Captain Kolokotronis and Captain Guice noticed a possible target on the radar about two miles away. The possible target turned out to be the M.L. CROCHET. Captains Kolokotronis, Guice, and Rodrigues discussed the possible target. Captains Kolokotronis and Guice attempted to calibrate the radar to remove the clutter from the rain and make a plot of the target. The calibration was unsuccessful; the possible target would appear "a few seconds on, a few seconds off." After seeing the possible target, the MINERVA MAYA did not alter its course to starboard. No crew member contacted VTS for assistance in identifying the possible target, nor did a crew member call out to the possible target.[2] (Doc. No. 68-3 at

---

[2] Captain Kolokotronis testified that he thought Captain Rodrigues "started calling through [the] VHF [radio]" after the possible target was spotted. (Doc. No. 68-3 at 37:20–21.) However, the parties played many segments of the radio communications made that day and never played a call matching this description, nor did Captain Rodrigues or Captain Guice mention a similar call in their testimony, except for the sécurité call.

33–42.)

28. During the conversation about the possible target, Captain Kolokotronis still did not mention the second AIS on board. Had the pilots known about the second AIS, they would have used it. The process for switching to the second AIS would have been as simple as moving a plug from one AIS controller to the other. Had they switched to the second AIS, they would have seen and contacted the M.L. CROCHET to make a passing arrangement. (Tr. Tran. Vol. 1 at 78–79, 91–93; Tr. Tran. Vol. 2 at 181; Doc. No. 68-11 at 59:18–25.)

29. Also in response to the worsening weather, Captain Rodrigues ordered the sounding of fog signals. He further ordered the ship to half ahead at 8:15:18 AM. The MINERVA MAYA had been sailing at full ahead, which resulted in a speed of 12 to 13 knots. The options are full ahead, half ahead, slow ahead, dead slow ahead, stop, dead slow astern, slow astern, half astern, and full astern. At full ahead, the engine's speed is 81 revolutions per minute. The order to half ahead reduced the engine speed to 62 revolutions per minute. (Tr. Tran. Vol. 1 at 98:9–102:23, 122:10–124:12; Doc. No. 68-3 at 64:7–11; Doc. No. 68-11 at 76:14–77:3; Plaintiff's Tr. Exs. 21, 28 & 52.)

30. How long it takes for a vessel to slow down in response to an order to half ahead and then to slow ahead depends on the current and wind. In this case, the MINERVA MAYA had a one-knot ebb current pushing behind her and a stern wind. Both factors helped propel the ship forward. As a result, it would take roughly 10 minutes for the vessel to go from 13 knots to 9 knots. (Tr. Tran. Vol. 1 at 53:11–21, 100:18–102:23, 125:21–126:18.)

31. At 8:16:43 AM, VTS communicated with the captain of the M/V C.J. BOYNE via Channel 12. The C.J. BOYNE was sailing inbound. VTS said that it had the C.J. BOYNE

12

"running outside the channel" and asked about the visibility. The C.J. BOYNE reported that visibility was poor and that it was going to get out of the channel and let the outbound ship, which was the MINERVA MAYA, pass. (Tr. Tran. Vol. 1 at 175:22–176:19.)

32. When Captain Dupre heard this exchange, the C.J. BOYNE was just ahead of him. That is when Captain Dupre saw the rain coming down. His plan was to try "to get above [buoy] 32 in [the] deeper water to get [his] tow out of the channel and wait until [the] weather passed." (Tr. Tran. Vol. 3 at 68:13–18.)

33. At 8:17:20 AM, VTS gave a traffic and weather report via radio on Channel 12. VTS reported, "199 on outbound ship around 34." The outbound ship at buoy 34 was the MINERVA MAYA. VTS continued, "And be advised, M[.]L[.] CROCHET long tow, inbound there at 32. C.J. BOYNE just ahead of him, and then the marker and 8 just ahead of him. All running extremely slow, Captain, around 2 knots, due to weather and visibility." Captain Dupre heard the report of the outbound ship at buoy 34, but he did not see that ship on his AIS. With the rain at buoy 34, Captain Dupre also could not see the ship on his radar. (Tr. Tran. Vol. 3 at 69:24–71:19.)

34. Although the MINERVA MAYA's AIS malfunctioned in its receipt and/or display of information on Captain Rodrigues's PPU, the MINERVA MAYA continued to transmit its vessel information through AIS. The Coast Guard VTS and PortVision, a private company that collects and stores AIS data independently from the Coast Guard, received the MINERVA MAYA's AIS transmissions continuously. (Tr. Tran. Vol. 1 at 58–59, 179–80.)

35. Despite the Coast Guard and PortVision being able to see the MINERVA MAYA's position from its AIS transmissions, Captain Dupre could not. Maya argues that Captain Dupre's claim that he did not see the MINERVA MAYA on his AIS is incredible because there was no mention of this problem in the accident report that D&S Marine submitted to the Coast Guard four days after the collision. However, the consequence of disbelieving Captain Dupre would be that the M.L. CROCHET intentionally moved into the MINERVA MAYA's path, thereby risking the lives of the crew. A captain with his experience would not intentionally take that risk.

36. Although Captain Dupre could not see the ship on his AIS or radar, he knew the approximate location of the ship about four minutes before the collision, knew that the ship was coming towards him because it was outbound, knew that the outbound ship would have to be in the main channel, knew that it was customary for ships to maintain the centerline, and knew that something was amiss given the MINERVA MAYA not showing up on his AIS where VTS reported it to be. Even with this more limited information, he should not have assumed that the MINERVA MAYA would not reach him before he could make it above buoy 32. Rather, he should have maintained his position in the barge lane. (Tr. Tran. Vol. 3 at 107:17–108:8, 126:11–20.)

37. When discussing how the MINERVA MAYA was not appearing on his AIS or radar, Captain Dupre testified that "it's kind of hard to be dodging a ghost ship." (Tr. Tran. Vol. 3 at 72:16–17.) However, if Captain Dupre had stayed in the designated barge lane, he would not have had to worry about dodging a ship.

38. At 8:19:34 AM, Captain Rodrigues ordered the engine to slow ahead. The engine went from 63 revolutions per minute to 43 revolutions per minute. (Tr. Tran. Vol. 4 at 40:1–

21; Plaintiff's Tr. Ex. 28.)

39. At 8:20:36 AM, the M.L. CROCHET was in the outer bounds of the barge lane far to starboard. Then, the M.L. CROCHET began moving out of the barge lane and into the main channel. Until this time, the M.L. CROCHET had been in the barge lane. (Tr. Tran. Vol. 1 at 177:17–178:24, 183:2–14.)

40. The severe weather at the time of the collision impaired Captain Dupre's ability to control his tow. The Court heard conflicting evidence on this point. Captain Dupre testified that the weather did not impact his ability to maneuver the M.L. CROCHET and he maintained complete control, but Captain Maurice Ryan, D&S Marine's expert of master vessels, testified that the wind made the tug difficult to maneuver. Captain Ryan and Captain Tulloch testified that the force of the strong winds on the empty barges caused a lever effect that made the tow difficult to maneuver. In addition, the Channel 12 communications demonstrate that the C.J. BOYNE, which was just ahead of the M.L. CROCHET, and the MARTHA RENAE were having difficulties maneuvering because of the weather. The M.L. CROCHET is more powerful than at least the MARTHA RENAE—1,200 horsepower compared to 800. But even so, the Court finds it more likely than not that the weather diminished the tow's maneuverability. (Tr. Tran. Vol. 1 at 165; Tr. Tran. Vol. 3 at 66:9–14, 128:13–24, 219–20; Tr. Tran. Vol. 4 at 5:3–6:15.)

41. At 8:21:36 AM, the MINERVA MAYA and the M.L. CROCHET collided in the main channel. Seconds before the collision, Captain Kolokotronis and Captain Guice spotted the two white lights on the M.L. CROCHET tugboat. Likewise, Captain Dupre first saw the MINERVA MAYA's bullnose emerge from the rain about 250 feet off the end of his tow. Each vessel turned hard to starboard in an attempt to avoid a collision and save the

15

lives of the tug's crew. Those evasive maneuvers were insufficient to avoid a collision. The M.L. CROCHET's lead empty barge scraped down the MINERVA MAYA's port side. The two empty barges came loose. One of the M.L. CROCHET's loaded barges also struck the MINERVA MAYA's port side. (Doc. No. 68-3 at 9:25–10:22, 50:24–52:12; Tr. Tran. Vol. 3 at 77–79, 86:6–87:2, 156–160.)

42. Captain Dupre called VTS on Channel 12 at about 8:24 AM. He reported the collision and his loose barges, which he was working to collect. About two minutes later, Captain Rodrigues reported to VTS that he was unsure whether the vessels had made contact. (Tr. Tran. Vol. 3 at 88:21–90:5.)

43. At the time of the collision, the MINERVA MAYA was where it was supposed to be—in the center of the main channel. The M.L. CROCHET was not where it was supposed to be because it was outside the barge lane and in the main channel. Although Captain Dupre testified that he did not feel that he was in the wrong place, he also testified that he did not need to be in the barge lane because there is no law stating that tugboats must stay in the barge lane. However, he further testified that tugboats "can get out in the channel as long as there is no oncoming or overtaking ships or nothing." Given his knowledge about the nearby outbound ship that would be sailing along the centerline of the main channel, this was a time when there was an oncoming ship that required him to stay in the barge lane. (Tr. Tran. Vol. 2 at 231:1–5, 233:2–235:20; Tr. Tran. Vol. 3 at 92:7–93:16.)

44. As a result of the collision, the MINERVA MAYA suffered $831,135.52 in physical damages and related costs. The M.L. CROCHET's physical damages and related costs were $140,000. The M.L. CROCHET's fair market value, with no pending freight, was $950,000. (Tr. Tran. Vol. 1 at 5:9–22.)

45. At the time of the collision, the MINERVA MAYA was chartered for her next employment with Irving Oil. She was contracted to load at Nederland, Texas, and to transport the cargo to Canaport, Canada. The charter required the MINERVA MAYA to be at the port of loading from June 3 to 4. Because the MINERVA MAYA was undergoing repairs at that time, she could not complete this charter. The total duration of the charter party was 14 days, and the net profit would have been $449,755. Under the charter, the demurrage rate was $22,000 per day. The MINERVA MAYA would have been owed this demurrage rate if she had been delayed in the discharging of her cargo by more than the agreed lay time of 72 hours. (Tr. Tran. Vol. 2 at 14:22–25:12, 60:24–62:11.)

46. As a result of the collision, the five barges that the M.L. CROCHET was pushing suffered physical damages and required repair. The barges were out of service while undergoing repairs, which resulted in lost profits to Canal Barge Company. D&S Marine indemnified Canal Barge Company for the repairs and loss of use of the barges, as required by the agreement between those companies. For four of the barges, the fair and reasonable rate per day was $850. Collectively, these four barges were out of commission for repairs for 36 days. For the fifth barge, the fair and reasonable rate per day was $1,300 and the barge was out of commission for repairs for 6 days. The total loss of use for all five barges was $38,400. (Tr. Tran. Vol. 4 at 44–57; Defendant's Tr. Ex. 13 at 1–3.)

## III.   CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under its general admiralty and maritime jurisdiction. *See* 28 U.S.C. § 1333.

Legal Standards

2.  It is a fundamental rule in admiralty law that damages "are to be apportioned on the basis of the comparative fault of the parties." *Pennzoil Producing Co. v. Offshore Express Inc.*, 943 F.2d 1465, 1469 (5th Cir. 1991).

3.  A claim for relief for maritime negligence has four elements. These elements are:

> (1) The existence of a duty required by law which obliges the person to conform to a certain standard of conduct in order to protect others against unreasonable risks.
> (2) A breach of that duty by engaging in conduct that falls below the applicable standard or norm. . . .
> (3) A reasonably close causal connection between the offending conduct and the resulting injury; this element is called "proximate cause."
> (4) Actual loss, injury, or damage . . . .

2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-2 (5th ed. 2013).

4.  "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006). To establish the causation element, "a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" *Am. River Trans Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (quoting *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)).

5.  The rule of pure comparative fault governs admiralty cases. "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision . . . , liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to

measure the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975).

6. Under the *Pennsylvania* Rule, "a vessel in derogation of a statutory rule bears the burden of demonstrating that its fault could not have been the cause in fact of the casualty." *In re Mid-South Towing Co.*, 418 F.3d 526, 533 (5th Cir. 2005). However, "the Supreme Court, in *The Pennsylvania*, [86 U.S. (19 Wall.) 125 (1873)], did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." *Compania De Maderas De Caibarien, S. A. v. The Queenston Heights*, 220 F.2d 120, 122–23 (5th Cir. 1955). Rather, for a party to be liable for its statutory violation, that fault "must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Bd. of Comm'rs of the Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir. 1978). The *Pennsylvania* Rule applies to violations of statutes and regulations that are proven by a preponderance of the evidence. *See Pennzoil Producing Co.*, 943 F.2d at 1472; *Skidmore v. Grueninger*, 506 F.2d 716, 722 (5th Cir. 1975).

7. At the time of the collision, the MINERVA MAYA was subject to the Navigation Safety Regulations on AIS and non-operating equipment. The MINERVA MAYA was required to have "a properly installed, operational, Coast Guard type-approved AIS." 33 C.F.R. § 164.46(b). If a vessel's AIS "stops operating properly, the person directing the movement of the vessel must report or cause to be reported that it is not operating properly [to VTS] as soon as possible." 33 C.F.R. § 164.53(b).

8. While in the Ship Channel, the MINERVA MAYA and the M.L. CROCHET were

subject to the Inland Navigation Rules, 33 C.F.R. §§ 83.01–83.38. *See* 33 C.F.R. § 83.01(a) ("These Rules apply to all vessels upon the inland waters of the United States . . . ."). Inland Navigation Rules 5 through 9, 19, and 35 are relevant to this matter.

9.  Rule 5 (Look-out) requires every vessel "at all times [to] maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05.

10. Rule 6 (Safe speed) requires every vessel "at all times [to] proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions." 33 C.F.R. § 83.06. Six non-exclusive factors must be taken into account to determine a safe speed:

> (1) The state of visibility;
> (2) The traffic density including concentration of fishing vessels or any other vessels;
> (3) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
> (4) At night, the presence of background light such as from shore lights or from back scatter of her own lights;
> (5) The state of wind, sea, and current, and the proximity of navigational hazards;
> (6) The draft in relation to the available depth of water.

33 C.F.R. § 83.06(a). Vessels with operational radar must consider six more factors:

> (1) The characteristics, efficiency and limitations of the radar equipment;
> (2) Any constraints imposed by the radar range scale in use;
> (3) The effect on radar detection of the sea state, weather, and other sources of interference;
> (4) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
> (5) The number, location, and movement of vessels detected by radar;
> (6) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

33 C.F.R. § 83.06(b).

11. Rule 7 (Risk of collision) requires every vessel to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist." 33 C.F.R. § 83.07(a). Rule 7 further provides: "Assumptions shall not be made on the basis of scanty information, especially scanty radar information." 33 C.F.R. § 83.07(c).

12. Rule 8 (Action to avoid collision) states: "A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel." 33 C.F.R. § 83.08(f)(1).

13. Rule 9 (Narrow channels) requires "[a] vessel proceeding along the course of a narrow channel or fairway [to] keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." 33 C.F.R. § 83.09(a)(i). Rule 9 further mandates that a vessel "not cross a narrow channel or fairway if such crossing impedes the passage of a vessel which can safely navigate only within such channel or fairway." 33 C.F.R. § 83.09(d).

14. Rule 19 (Conduct of vessels in restricted visibility) provides:

> A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collision exists. If so, she shall take avoiding action in ample time, provided that when such action consists of an alteration of course, so far as possible the following shall be avoided: (i) An alteration of course to port for a vessel forward of the beam, other than for a vessel being overtaken.

33 C.F.R. § 83.19(d)(i).

15. Rule 35 (Sound signals in restricted visibility) requires power-driven vessels making their way through the water to "sound, at intervals of not more than 2 minutes, one prolonged

blast" when "[i]n or near an area of restricted visibility." 33 C.F.R. § 83.35(a). "The term restricted visibility means any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms, or any other similar causes." 33 C.F.R. § 83.03(l).

Liability of D&S Marine

16. The M.L. CROCHET did not act negligently by entering the Houston Ship Channel. Other tugboats remained at Bolivar because of limited dock space. Further, when the M.L. CROCHET entered the Channel, the weather was clear.

17. The M.L. CROCHET's tow was not negligently configured. The strung-out configuration was required for the part of the run on the Intracoastal Waterway, there was no room to reconfigure at Bolivar, the configuration protected the most dangerous cargo in the middle barge from damage, and another configuration would have reduced maneuverability. Although the strong winds at the time of the collision reduced the tow's maneuverability, Captain Dupre decided to enter the Channel with his strung-out configuration when the weather was clear and with protecting the dangerous cargo in the middle barge in mind.

18. The M.L. CROCHET violated Rule 35 by not sounding his fog horn before the collision. D&S Marine contends that Captain Dupre did not have time to sound the fog horn when he spotted the MINERVA MAYA because he was making a drastic maneuver to starboard to save his and his crew's lives. However, the M.L. CROCHET was near an area of restricted visibility before he saw the MINERVA MAYA. Captain Dupre heard the exchange beginning at 8:16:43 AM between the VTS and the C.J. BOYNE when the C.J. BOYNE was just ahead of him and was reporting poor visibility. At this point,

Captain Dupre could see the rain coming down. Therefore, he was near an area of restricted visibility and should have sounded his fog horn. However, the Court will not apply the *Pennsylvania* Rule presumption because the causative relationship between not sounding the fog horn and the collision is too speculative. Given the other vessels in the vicinity, it is mere conjecture that the lookout on the bow of the MINERVA MAYA would have been able to tell that the fog horn was coming from the M.L. CROCHET.

19. The M.L. CROCHET did not act negligently by not contacting the MINERVA MAYA to make a passing arrangement. The custom on the Houston Ship Channel is that outbound ships contact inbound tugs if a passing arrangement is necessary.

20. The M.L. CROCHET violated Rule 9(a)(i) by not staying in the designated barge lane. Rule 9 applies only in "narrow" channels, which includes the Houston Ship Channel. *See Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 892 (5th Cir. 2013) ("Although the [Inland Navigation Rules] do not define 'narrow channel,' we have held that the term generally includes bodies of water that are less than 1,000 feet in width."). Under Rule 9, the M.L. CROCHET was obligated to stay as far to her starboard as was "safe and practicable." 33 C.F.R. § 83.09(a)(i). That would have been in the barge lane, not the main channel.

21. The M.L. CROCHET did not violate Rule 9(d). The vessel was not "cross[ing] a narrow channel" at the time of the collision. 33 C.F.R. § 83.09(d). Rather, Captain Dupre was trying to get the M.L. CROCHET out of the Channel and into the deeper water above buoy 32.

22. There is insufficient evidence that the M.L. CROCHET's crew violated Rule 19 by turning to port shortly before the collision. Captain Tulloch testified about the M.L.

CROCHET's course over ground in the ten or so minutes leading up to the collision. The course over ground is the path of the antenna located on the tug. The tug is in the barge lane until about thirty to sixty seconds before the collision when she moves out of the barge lane and into the main channel. However, Captain Tulloch's testimony does not establish that Captain Dupre turned to port. Captain Dolan explained that the heading provides the vessel's actual orientation. The Coast Guard data that Captain Tulloch used to plot the M.L. CROCHET's course over ground does not include the heading data. Without the heading line, it is possible to misapprehend the direction of a vessel. Moreover, because the antenna is on the vessel's stern, a turn to starboard would cause the stern to move to port. Put another way, Maya has proven the M.L. CROCHET's path into the main channel, which was negligent as discussed above, but Maya has not shown that the cause of that movement into the main channel was a turn to port. Rule 19(d)(i) prohibits only an "alteration of course to port." (Tr. Tran. Vol. 1 at 182–83, 207; Tr. Tran. Vol. 2 at 224–30.)

<u>Liability of Maya</u>

23. The MINERVA MAYA violated 33 C.F.R. § 164.46(b) by not having a fully operational AIS at the time of the collision. Had the AIS been fully operational, Captain Rodrigues would have seen the M.L. CROCHET and initiated a passing arrangement as he did with the MARTHA RENAE.

24. The MINERVA MAYA violated Rule 7. Captain Kolokotronis knew about the second AIS system but did not tell the pilots about it. By not disclosing the second AIS, Captain Kolokotronis did not follow Rule 7's mandate to "us[e] all available means appropriate to the prevailing circumstances and conditions." 33 C.F.R. § 83.07(a). Moreover, as a

matter of prudent seamanship and reasonable care, Captain Kolokotronis should have told

the pilots about the second AIS when they were discussing the problem with the AIS not

receiving other vessels' transmissions. As Captain Guice testified, "[A]s a matter of good

seamanship, we're supposed to, you know, use any and all available means at our

disposal. You know, I didn't know that that means existed or I would have tried to use it

properly." (Tr. Tran. Vol. 1 at 93:2–6.) Had the pilots connected to the functioning AIS,

they would have seen the M.L. CROCHET and called out to her by name.

25. There is insufficient evidence that Captain Kolokotronis acted negligently by not

informing the pilots that the AIS malfunctioned in bad weather. As Maya argues, the

evidence on which D&S Marine relies to assert that Captain Kolokotronis knew about

weather-related problems with the MINERVA MAYA's AIS is thin. D&S Marine bases

its argument on the following testimony from Captain Kolokotronis:

> Q. Okay. What did you see?
> A. Nothing.
> Q. It was just empty?
> A. Same with pilot's laptop.
> Q. Okay. Do you know why?
> A. No.
> Q. Anything mechanically wrong or you think it was the weather?
> A. I believe the weather.
> Q. Does that happen sometimes with the weather?
> A. Yes.

(Doc. No. 68-3 at 66:16–67:1.) The Court finds this general testimony too vague to

support a finding that Captain Kolokotronis knew that the MINERVA MAYA's AIS

malfunctions in bad weather and should have warned the pilots of that recurring problem.

26. The MINERVA MAYA did not breach any duty of care by failing to move to her

starboard side after its AIS stopped fully functioning. Captain Ryan testified that "it

would be imprudent to alter course" based on a possible target because "[i]f you still

25

don't know where the other potential object is, you might make the wrong decision." (Tr. Tran. Vol. 3 at 175:17–20.) The Court agrees with Captain Ryan's analysis.

27. However, as a matter of prudent seamanship and reasonable care, a compulsory pilot or MINERVA MAYA crew member should have contacted VTS after noticing a possible target. Given VTS's purpose to share information to help avoid collisions, a reasonably prudent mariner would have sought VTS's assistance in confirming or denying the presence of the possible target when the weather conditions were deteriorating and the AIS was not working. Had someone on board the MINERVA MAYA contacted VTS, VTS would have conveyed the M.L. CROCHET's location, as it did during its traffic report beginning at 8:17:20 AM.

28. The MINERVA MAYA did not act negligently by not contacting the M.L. CROCHET. Because the AIS was not functioning fully, the MINERVA MAYA crew did not have the M.L. CROCHET's name, so the crew could not call out to the M.L. CROCHET by name. It is speculative whether calling out to the vessel based on its possible location would have led to contact between the two vessels in time to avoid the collision, especially with the M.L. CROCHET not seeing the MINERVA MAYA on its screen and the poor visibility. Rather than calling out to the possible target, the MINERVA MAYA crew should have called VTS.

29. The MINERVA MAYA violated Rule 5. Although Mr. Castillo was posted as a lookout, no crew member in the bridge contacted him via radio after identifying a possible target. Someone in the bridge should have relayed the location of a possible target to Mr. Castillo so that he could focus on the area of the potential target. Mr. Castillo had previously been a lookout on ships in bad weather where the captain called him to tell

26

him about a possible target on the radar. (Doc. No. 68-9 at 14:4–18.) Moreover, as a matter of prudent seamanship and reasonable care, the lookout should have been contacted. (Tr. Tran. Vol. 1 at 110:14–19, 223:24–225:5; Tr. Tran. Vol. 4 at 21:23–22:10.) However, the Court will not apply the *Pennsylvania* Rule presumption because the causative relationship between not notifying the lookout and the collision is too speculative. It is mere conjecture that Mr. Castillo would have been able to spot the M.L. CROCHET, given the prevailing conditions, in time for the MINERVA MAYA to take an adequate evasive maneuver.

30. The MINERVA MAYA did not violate Rule 6. Captain Rodrigues ordered the vessel to half ahead at 8:15:18 AM and ordered the vessel to slow ahead at 8:19:34 AM. The collision occurred at 8:21:36 AM, or about six minutes after the order to half ahead. Captain Guice testified that it would take about ten minutes to slow the ship down from 13 knots to 9 knots. Although Captain Ryan testified that a safe speed for the MINERVA MAYA would have been 4 to 6 knots, and at that speed, the collision would have been avoided, there is insufficient evidence that the MINERVA MAYA would have been able to achieve that speed, while maintaining adequate maneuverability, in time to avoid the collision.

31. The MINERVA MAYA violated 33 C.F.R. § 164.53(b) by not alerting VTS to its AIS problem. Maya suggests that the MINERVA MAYA was too busy to contact VTS before the collision because its crew was dealing with the strong storm conditions and was repeatedly broadcasting the vessel's position. The Court disagrees. With the bad weather conditions significantly reducing the utility of radar and the MINERVA MAYA's observation of a possible target, the MINERVA MAYA should have contacted VTS

rather than merely broadcasting its position. VTS would have then communicated with the M.L. CROCHET as it had communicated with the MARTHA RENAE and the C.J. BOYNE after noticing the problem of them heading outside the Channel.

32. There is insufficient evidence that MINERVA MAYA breached any duty of care by not monitoring Channel 12. The Coast Guard's letter granting a permanent deviation from maintaining a listening watch on Channel 12 remains in place.

Apportioning Fault

33. In sum, the Court finds that the M.L. CROCHET and/or its crew acted negligently by not staying in the designated barge lane. The Court finds that the MINERVA MAYA and/or its crew acted negligently by not having a fully operational AIS, not informing the pilots about the second AIS, and not contacting VTS about the possible target and the problem with their AIS. Weighing all the evidence and the negligent acts of the each party, the Court finds that D&S Marine is 50% responsible and Maya is 50% responsible for the collision.

Limitation of Liability

34. The Shipowners' Limitation of Liability Act "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001); *see* 46 U.S.C. § 30505(a). "Ordinarily 'errors in navigation or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes.'" *Mac Towing Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982) (quoting *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977)). If an owner selects a competent master or crew and does not have notices of any previous navigational

errors, then the limitation will apply. *See Petition of Kristie Leigh Enters., Inc.*, 72 F.3d 479, 481 (5th Cir. 1996).

35. D&S Marine claims that its liability should be limited to the fair market of value of the M.L. CROCHET, which is $950,000. In its response to D&S Marine's Post-Trial Memorandum of Law, Maya does not dispute the applicability of the Shipowners' Limitation of Liability Act. Captain Dupre had copious experience navigating tugs on the Channel, and there is no evidence that he had previous navigational errors about which the owner of the D&S Marine knew or should have known. Accordingly, the Court finds that D&S Marine's liability is limited to $950,000.

Damages

36. "Full compensation has long been recognized as a basic principle of admiralty law, where '[r]estitutio in integrum is the leading maxim applied by admiralty courts to ascertain damages resulting from a collision.'" *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195–96 (1995) (quoting *Standard Oil Co. of N.J. v. S. Pacific Co.*, 268 U.S. 146, 158 (1925)). This measure includes "the cost of necessary repairs and the loss of earnings while they are being made." *Delta Marine Drilling Co. v. M/V Baroid Ranger*, 454 F.2d 128, 129 (5th Cir. 1972). Damages do not have to be proved with exact specificity. "It suffices if a state of facts is shown from which a court or jury can find with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred as a result of the collision." *Mitsui O. S. K. Lines, K. K. v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir. 1973). The claimed damages cannot be "merely speculative, and something else must be shown than the simple fact that the vessel was laid up for repairs." *Id.* (quoting *The Conqueror*, 166 U.S. 110, 127

(1897)).

37. "The unquestioned general rule governing the award of detention damages is that 'demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty.'" *Crain Bros., Inc. v. Duquesne Slag Prods. Co.*, 273 F.2d 948, 950 (3d Cir. 1959) (quoting *The Conqueror*, 166 U.S. at 125). "The use of substitute vessels to replace a damaged vessel is a form of mitigation of damages by a shipowner." *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1007 (5th Cir. 1984), *amended on reh'g*, 753 F.2d 378 (5th Cir. 1985). If a plaintiff is able to use other vessels in its fleet to perform the work that would have been done by the disabled vessel, the plaintiff has not suffered a compensable economic injury. *Bolivar Cty. Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1309 (5th Cir. 1978) (discussing *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170 (1932)). If a plaintiff has substitute vessels at its disposal, the plaintiff must show that the "substitute vessels would have been hired" for other jobs before it can be awarded lost profits for the substitute vessel's use in the job that the collision prevented the original vessel from completing. *See Domar Ocean Transp., Ltd., v. M/V Andrew Martin*, 754 F.2d 616, 620 (5th Cir. 1985).

38. Although the Fifth Circuit has referred to mitigation of damages through use of a substitute vessel from the plaintiffs' fleet as the "Fleet Rule," the court has not yet defined what constitutes a "fleet." *See Delta S.S. Lines, Inc.*, 753 F.2d at 379 ("We conclude, however, that the Fleet Rule, whatever it is, should not be applied in this case."). At D&S Marine's suggestion, and without any objection from Maya, the Court will borrow the test used to determine a person's status as a "seaman" under the Jones

Act. For a group of vessels to constitute an "identifiable fleet," the vessels must be under "common ownership or control." *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 556 (1997).

39. Once a fleet is established, the plaintiff must prove with reasonable certainty that the substitute vessel would have been otherwise hired. "[A] plaintiff seeking detention damages need not prove a specific lost opportunity." *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1141 n.3 (5th Cir. 1994). Proof that the substitute vessel was "active in a market ready for its services" is sufficient evidence to entitle a plaintiff to detention damages. *See In re M/V Nicole Trahan*, 10 F.3d 1190, 1195 (5th Cir. 1994).

40. D&S Marine has presented sufficient evidence to show that the MINERVA MAYA and ATALANDI were under common ownership or control and were thus part of the same fleet. Although Maya is the legal entity that owns the MINERVA MAYA and the MINERVA MAYA is Maya's only asset, the evidence shows that Minerva Marine, Inc. is the legal entity that controls the MINERVA MAYA, ATALANDI, and other members of its fleet. Maya Special Maritime Enterprise and Minerva Marine, Inc. have common employees and a common address. (Tr. Tran. Vol. 2 at 32–33; Defendant's Tr. Ex. 77.) Minerva Marine, Inc. and each individual holding entity enter into a Management Agreement that grants complete control of each vessel to Minerva Marine, Inc. (Tr. Tran. Vol. 2 at 38–39; Defendant's Tr. Ex. 78.) Moreover, Minerva Marine, Inc.'s website has an "Our Fleet" tab that lists the MINERVA MAYA and the ATALANDI as two of the twenty-eight Aframax tankers. (Defendant's Tr. Ex. 69.) The vessels share a common safety manual and many of their names begin with "MINERVA." (Doc. No. 68-6 at 17–19.) In addition, just as Maya Special Maritime Enterprise is the legal entity that owns the

MINERVA MAYA, Atalandi Special Maritime Enterprise is the legal entity that owns the M/T ATALANDI, Clara Special Maritime Enterprise owns the M/T MINERVA CLARA, and Roxanne Special Maritime Enterprise owns M/T MINERVA ROXANNE. (Defendant's Tr. Exs. 67.2 at 82, 67.3 at 1, 30.) Another substitution between Minerva Marine, Inc. vessels—the ATALANDI and the MINERVA CLARA—took place in February 2015. (Defendant's Tr. Ex. 67.1.)

41. Even though the MINERVA MAYA, ATALANDI, and other vessels managed by Minerva Marine, Inc. were part of the same fleet, Maya has met its burden to show that only the ATALANDI was available and it would have been otherwise hired. The testimony of Nikos Zarganas, the manager of the Freight, Demurrage, and Defense department at Minerva Marine, Inc., established that, at the time of the collision, the ATALANDI was very near the port of loading for Irving Oil, no other vessels in a similar class as the MINERVA MAYA or ATALANDI were in the vicinity or able to be at the port of loading on June 3, he would have been able to find other work for the ATALANDI had she not taken over the Irving Oil contract, and in June 2013 there was an active market for this class of vessels. (Tr. Tran. Vol. 2 at 96–97.) D&S Marine does not dispute any of this evidence other than to fault Maya for not producing corroborating documents. However, the Court finds credible Mr. Zarganas's testimony about the location of other vessels, the market, and the availability of work for the ATALANDI, especially given his fifteen years of experience in chartering vessels. (Tr. Tran. Vol. 2 at 82.)

42. D&S Marine disputes Maya's claim to loss-of-use damages of $22,000 per day for 10.1 days after the Irving Oil charter party ended, while the MINERVA MAYA was still

undergoing repairs. The Court agrees with D&S Marine that Maya's evidence supporting its claim for $22,000 per day is insufficient. The $22,000 figure comes from the demurrage rate in the Irving Oil charter party. However, the demurrage rate is what Irving Oil would have owed the MINERVA MAYA if she had been delayed in the discharging of her cargo by more than the agreed lay time of 72 hours. It is mere speculation to say that the MINERVA MAYA would have been delayed in discharging its cargo by 10.1 days, and that is the only scenario under which it would be owed the $22,000 demurrage rate. As a result, the Court finds that Maya has presented insufficient evidence to support its loss-of-use claim beyond the 14 days during which it would have completed the Irving Oil charter party.

43. As a result of the collision, Maya suffered $1,280,890.52 in damages, consisting of $831,135.52 for physical damages and related costs and $449,755.00 for loss of use. D&S Marine is liable for 50% of these damages, which amounts to $640,445.26.

44. As a result of the collision, D&S Marine suffered $178,400 in damages, consisting of $140,000 for physical damages and related costs and $38,400 for loss of use. Maya is liable for 50% of these damages, which amounts to $89,200.

45. Offsetting these amounts, D&S Marine owes Maya $551,245.26.

Prejudgment and Post-judgment Interest

46. "[A]n award for prejudgment interest in actions under the general maritime law is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable." *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986). "Interest is awarded not as a penalty or as compensation for loss of property use, but as compensation for the use of funds to which

the plaintiff was ultimately judged entitled, but which the defendant had the use of prior to judgment." *Id.* (quoting *Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813, 823 (11th Cir. 1984)).

47. The Court will award prejudgment and post-judgment interest. D&S Marine has not offered any unusual circumstances that would prevent the award of prejudgment interest, nor has it made any argument against post-judgment interest. The Court finds the briefing on the award or pre- and post-judgment interest insufficient and hereby orders supplemental briefing on the following questions:

   a. What rate of interest should be used?

   b. Should the interest be calculated on a simple or compound basis?

   c. From what date should prejudgment interest on loss-of-use damages run, if not the date of the collision?[3]

The parties should file their supplemental briefs no later than August 23, 2016. Responses should be filed no later than August 30, 2016.

48. If any finding of fact should more properly be characterized as a conclusion of law, it is hereby adopted as a conclusion of law. If any conclusion of law should more properly be characterized as a finding of fact, it is hereby adopted as a finding of fact.

## IV. CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that Maya and D&S Marine are equally at fault for the collision. Maya is entitled to damages in the amount of $551,245.26 plus prejudgment and post-judgment interest, which will be determined

---

[3] The Fifth Circuit expressly approved of the date of the collision as the starting point for prejudgment interest on repair costs. *Ryan Walsh Stevedoring Co.*, 792 F.2d at 492. On loss-of-use damages, the district court used the time the vessel was returned to service as the starting point for prejudgment interest on loss-of-use damages. *See id.*

after further briefing.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 9th day of August, 2016.

_____
THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE